NOT DESIGNATED FOR PUBLICATION

No. 119,306

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

WAYNE E. CLEMENTS,
*Appellant*.


MEMORANDUM OPINION

Appeal from Rooks District Court; BLAKE A. BITTEL, judge. Opinion filed May 7, 2021. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P.Whalen, of Wichita, for appellant.

*Michael J. Duenes*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.


Before GREEN, P.J., MALONE and WARNER, JJ.


PER CURIAM: Wayne Clements appeals his convictions for aggravated indecent liberties with a child and two counts of rape. He raises six issues on appeal: (1) that the trial court erred when it denied a jury recall to consider juror misconduct; (2) that the jury committed misconduct in failing to review all the evidence admitted at trial; (3) that the trial court erred when it refused to admit evidence involving the victim's sexual history; (4) that the trial court erred when it denied defendant a continuance for the purpose of obtaining a different expert witness: (5) that the prosecutor committed reversible error in closing argument: and (6) that cumulative error occurred during the trial requiring a

1

remand for a new trial. For the reasons stated below, we reject these arguments. Thus, we affirm.

In April 2016, 15-year-old J.E. asked one of her teachers, Shane Austin, for advice on how to stop someone from accessing her social media accounts. J.E. told Austin that Clements, a relative, was the one accessing her accounts. Austin asked if Clements had ever "crossed the line" sexually with her. Austin asked this question because he had seen J.E. and Clements together. Austin described that relationship as "real touchy-feely, almost more than what a normal [familial] relationship was, almost like they were boyfriend and girlfriend." J.E. told Austin that Clements had crossed a line and clarified that she meant sexually inappropriate touching. Austin took J.E. to the school counselor.

Marian Gier, the school counselor, reported Austin's conversation with J.E. to school authorities, who alerted the Kansas Department for Children and Families (DCF) and the Stockton police. Officer Don Earl and Sergeant Adam Bryant recorded interviews with J.E. at the high school. Both Gier and Austin sat with J.E. for portions of these interviews.

At trial, Earl testified about J.E.'s reaction to police involvement. He stated that she was "pissed off beyond belief." J.E. did not want the police involved, and she did not want her grandmother to know. J.E. lived with her grandmother, H.B., in Stockton, Kansas. J.E. was afraid that she would have to leave Stockton.

Earl also testified that J.E. "had a liking" for Clements. Also, Austin testified that J.E. "didn't want it to affect [Clements] because she still cared about him." During the interviews, J.E. said that she had sexual intercourse with Clements "approximately ten times." But she was only able to describe three incidents in more detail.

2

During the first interview, J.E. described the first incident as happening shortly after she arrived in Stockton, the summer between seventh and eighth grade. The second incident was later in that same summer period when J.E., her grandmother, Clements, and Clements' son went camping. Both incidents happened when J.E. was 13 years old. Clements was then 39 or 40 years old. The third instance of sexual intercourse happened around Christmas in 2015. Earl believed that J.E. fully knew what "sexual intercourse" meant.

After the police interviewed J.E. and she went home, J.E. called Bryant to tell him that she was going to retract her story because she wanted the investigation of Clements to end. According to Earl, "She just said she was going to say it was all a lie, because she didn't want us to do an arrest and prosecution or whatever." Also, Austin testified that "she was thinking about just lying to the police and saying that nothing had happened." J.E. had thought that her conversation with Gier would be confidential. The morning of the second interview, J.E. also told Gier that she wanted to retract her statement.

During that second interview of J.E. the following day, Earl said, "We need to know the truth whether it happened or didn't happen, the main thing we need to know is the truth." J.E. said that everything that she told them the day before was the truth.

Earl and Bryant interviewed Clements the same day as J.E.'s second interview. Clements denied inappropriately touching or having sexual relations with J.E. Clements stated that J.E. had made up a story about them being in a sexual relationship because she was mad at him.

H.B. testified that she was Clements' mother. J.E. started living with H.B. in 2013, and H.B. became her legal guardian in 2015. She testified that "[J.E.] had a tendency to want to hang on [Clements]. And I told [them] both we have rules here. To me that is an inappropriate behavior, and it will not be tolerated." H.B. stated that she never left J.E.

3

alone with Clements. But J.E.'s friend, A.M., testified that one time she came into H.B.'s house and saw J.E. and Clements alone together, sitting on the bed and looking at each other like a "newlywed couple." J.E. was removed from H.B.'s home and placed in foster care shortly after Clements' arrest.

At trial, J.E. testified that she "wanted to be with [Clements]" sexually. J.E. confirmed that she had sex with Clements about 10 times. J.E. recalled telling police about the first time that she had sex with Clements. J.E. responded to questions about her attempts to recant her story. She clarified that she was lying when she told Bryant that she had made the whole thing up. When asked why she called Bryant, J.E. stated it was because she did not want "this" to happen, referring to "Trial. Court. Ruining his life." She also clarified that she was telling the truth when she told police that she had sexual intercourse with Clements. When asked for a definition of sexual intercourse, J.E. stated: "A penis goes into a vagina and penetrates." She clarified that she understood sex when she had sex with Clements, explaining: "I've known what sex was since second grade." J.E. testified that she did not intend to tell anyone about her sexual relationship with Clements and "it slipped out" when she was talking to her teacher. She testified that if she had not told anyone she probably would still be having sex with Clements because she still loves him.

The defense played a recording of a conversation that Earl and Bryant had with Gier, the school counselor. Just before Earl and Bryant's second interview with J.E., Gier told the officers about a conversation that she had with J.E. That morning, J.E. told Gier that she was going to tell the police that she made the whole thing up. Gier explained to J.E. that she had opened a can of worms and that she could not go back and "unsay those things."

The State charged Clements with one count of rape, sexual intercourse with a 13-year-old, in violation of K.S.A. 2014 Supp. 21-5503(a)(3), occurring between June 1,

4

2014, and July 18, 2014. The State also charged a second count of rape, occurring on or about July 18, 2014. And the State charged Clements with one count of aggravated indecent liberties with a child—sexual intercourse with a 15-year-old child, in violation of K.S.A. 2015 Supp. 21-5506(b)(1), occurring in December 2015.

During the prosecutor's closing argument, the trial court sustained two defense objections that the prosecutor attempted to shift the burden of proof onto Clements.

The jury found Clements guilty of all three charged crimes. In the two rape convictions, the trial court sentenced Clements to life imprisonment with parole eligibility after 25 years. The court made those sentences concurrent with a 94-month prison sentence for aggravated indecent liberties with a child.

Clements timely appeals.

*Did the Trial Court Err in Denying a Recall of the Jurors to Address Alleged Juror Misconduct?*

Clements argues that the trial court abused its discretion by failing to recall Juror R.B. and other jurors to testify on whether Juror R.B.'s hasty generalization and biased statement had adversely influenced them about the case. On the other hand, the State argues that because the trial court is precluded from questioning a jury's mental processes, the court did not err when it refused to recall the jury.

Whenever juror misconduct is alleged, the trial court must decide a threshold question as to whether juror testimony may be received. If the evidence concerns the mental processes of the jury, it will typically not be allowed unless it will demonstrate that the jury intentionally disregarded the court's instructions. *State v. Wainwright*, 18 Kan. App. 2d 449, 453, 856 P.2d 163 (1993). A trial judge's decision to deny a motion to

5

recall a jury is reviewed for an abuse of discretion. *State v. Hirsh*, 310 Kan. 321, 343, 446 P.3d 472 (2019). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Ingham*, 308 Kan. 1466, 1469, 430 P.3d 931 (2018).

After trial but before sentencing, Clements moved for a new trial on grounds of jury misconduct, prosecutorial misconduct, and other issues not before this court on appeal. At a hearing on the motion, H.B. testified that she heard a man state the following:  "This is a piece of cake. . . . We already know how this is going to end." She testified that this man directed his statement to another man who did not respond to the statement. H.B. explained that during the lunch break, she heard this statement on the first day of evidence. H.B. did not know if the man who spoke this statement was a juror. Her testimony was vague and contradictory about when she realized that the man who made the statement was a juror. For example, on cross-examination, the following exchange occurred between H.B. and the prosecutor:

> "Q. [Prosecutor:] At what point did you figure out that guy was a juror that you heard say that?
> "A. [H.B.] I didn't until the very end.
> "Q. At—
> "A. Didn't know who he was.
> "Q. So when did you figure out who he was?
> "A. The day that we came up for the verdict.
> . . . .
> "Q. And you recognized him?
> "A. When we came in here to read the verdict, I still didn't look at your jury. I looked at the judge.
> "Q. So when did you recognize that it was a juror? I thought you said when they came in to do the verdict?
> "A. When we were all leaving."

6

On direct examination, H.B. testified that she later contacted defense counsel about the misconduct after the trial was over. But her testimony on cross-examination was that she told defense counsel much earlier. H.B. said, "I just told her what I had heard, and I did that when I first came upstairs and had a chance to talk to her. You don't know who to tell when you hear stuff like that." H.B. again contradicted herself, implying that she did not identify the juror until after the conclusion of trial, stating: "The man that I recognized on Tuesday was leaving here when court was over." H.B.'s timeline changed once again when she had the following exchange with the prosecutor:

"Q. When did you tell her [Clements' defense attorney] that?
"A. When we came upstairs and you guys had dismissed for going to whatever they go do
. . . .
"Q. So immediately after trial you talked to her about it?
"A. It was before it was dismissed. They had gone to go do whatever it is they do.
"Q. Oh, they went to the deliberations?
"A. Yeah."

H.B.'s testimony contains two major deficiencies. First, she identified only a man as the speaker of the alleged biased statement, but she did not identify the man to whom the statement was directed. Clements' new trial motion states that the person to whom the statement was made was a juror, but there is no evidence establishing this contention. The trial judge reiterated, in his journal entry denying the jury recall, H.B.'s testimonial statement: "I don't know who is who." This refutes Clements' contention that the person who spoke this statement shared it with a juror.

Thus, we must ask ourselves the following question: Does our record establish that H.B. overheard a juror say to another juror: "This is a piece of cake. . . . We already know how this is going to end?" No, the evidence does not support this conclusion. When H.B. overheard this statement, the evidence is lacking that it was made by a juror. For example, when the prosecutor asked H.B. what was going on around her and if she

"realize[d] they were jury members that day, she responded:  "No, I had no idea." And when the prosecutor specifically asked, "So you took that as this has to be jury people talking about the case?" H.B. replied, "No, I took it as why are you saying that when this is the first day of trial."

What should we call this? In rhetoric, this would be referred to as the stasis of conjecture. Stasis in conjecture concerns whether the act occurred. The following questions would be relevant:  Did H.B. overhear a person speak the above-referenced statement? Was the statement spoken to a juror? Was the person who spoke the statement a juror? What, if any, response was made to the statement? H.B. answered only the first question:  that she overheard someone speak the above-referenced statement. Thus, based on H.B.'s responses to the prosecutor's questions and H.B.'s startling inconsistencies, a reasonable person could not accept this as being sufficient evidence to conclude that H.B. overheard a *juror* say to *another juror*:  "This  is a piece of cake. . . . We already know how this is going to end." (Emphasis added.) For this reason, we reject Clements' jury misconduct argument.

Second, even if we were to believe that a juror made the above-referenced statement to another juror, H.B. did not establish when she told Clements' defense counsel about overhearing this statement. For example, did she tell Clements' defense attorney before or after the jury rendered its verdict? When a party or a party's counsel is aware of alleged juror misconduct before the jury renders its verdict and fails to object, the party cannot later claim the alleged misconduct as grounds for a new trial. *State v. Williams*, 299 Kan. 509, 561, 324 P.3d 1078 (2014), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Thus, the trial court needed to know when Clements' counsel became aware of the above-referenced statement since it would influence the court's ruling on the motion for a new trial.

8

On appeal, Clements argues that the trial court erred by not recalling the jury. In *State v. Ruebke*, 240 Kan. 493, 513, 731 P.2d 842 (1987), our Supreme Court warned that jury recalls should not be undertaken lightly, stating the following:

> "Jurors may be recalled for post-trial hearings only by order of the court after a hearing on a request to recall the jury. A recall of the jury is not a routine matter. Jury service is a public duty of citizens and recall of jurors after their service has ended to testify as to events occurring in the jury room during deliberations is a serious step. That step is to be undertaken only for just cause. The procedure should never be utilized as a fishing trip upon a losing party's hope that jury misconduct might surface if the jurors could be questioned under oath. The burden is upon the party seeking an order to recall the jurors to show the necessity for the order. [Citation omitted.]"

Further, the information that jurors can supply on recall is limited by statute. K.S.A. 60-441 states:

> "Upon an inquiry as to the validity of a verdict or an indictment no evidence shall be received to show the effect of any statement, conduct, event or condition upon the mind of a juror as influencing him or her to assent to or dissent from the verdict or indictment or concerning the mental processes by which it was determined."

This prohibition on peeking into a juror's mind is balanced against the hard reality of the physical world which is addressed in K.S.A. 60-444, which states in part:

> "This article shall not be construed to (a) exempt a juror from testifying as a witness to conditions or occurrences either within or outside of the jury room having a material bearing on the validity of the verdict or the indictment, except as expressly limited by K.S.A. 60-441."

Our Supreme Court has provided a practical reason for this balance, stating the following:

9

> "The mental process of a juror in reaching a verdict or the factors which influence the mental process cannot be inquired into for the purpose of impeaching a verdict. Public policy forbids the questioning of a juror on these matters for a very obvious reason, i.e., there is no possible way to test the truth or veracity of the answers. [Citation omitted]" *Saucedo v. Winger*, 252 Kan. 718, 729, 850 P.2d 908 (1993).

Thus, the trial court could allow only limited evidence concerning juror misconduct in *State v. Kleypas*, 272 Kan. 894, 966, 40 P.3d 139 (2001). For example, Gary W. Kleypas was sentenced to death for the murder of C.W. During the guilt phase, Juror G., who was also a police officer, consulted the Kansas Criminal Code and Procedure Handbook produced by the Kansas Peace Officers Association. Juror G. kept the handbook in her purse. She "'may have'" read portions of it to the jury. 272 Kan. at 966. The trial court recalled the jury, but Kleypas objected to the limited scope of the jury recall hearing. Our Supreme Court ruled that a proper inquiry could investigate whether Juror G. read from the handbook, but not what effect that might have had on the thought processes of the jurors. 272 Kan. at 968. The truth or veracity of whether Juror G. read aloud to other jurors could be tested, for example, by affidavits or corroborating testimony from multiple jurors. See *Saucedo*, 252 Kan. at 729. But there is no way to test the truth or veracity of what effect, if any, the misconduct had on the other jurors' thought processes.

The trial court here correctly refused to recall jurors because, under the limitations of K.S.A. 60-441 and K.S.A. 60-444, a hearing would have produced no further relevant information. H.B. testified that one juror stated: "This is going to be a piece of cake. . . . We already know how this is going to end" to a man who may have also been a juror. If the court had recalled the jury, the recall hearing would have been limited to verifying that a juror had made the statement and that the person to whom he directed the statement was also a juror in this case. The recalled jurors would not have been allowed to answer questions about what caused the juror to make the statement or if the person to whom the

statement was made agreed or disagreed with the statement. These are precisely the types of questions that K.S.A. 60-441 prohibits.

When reviewing claims of juror misconduct, the trial court must use a two-step inquiry to determine if a new trial or declaration of a mistrial is warranted. First, the court must determine "(1) whether juror misconduct occurred, and (2) if so, whether the misconduct substantially prejudiced the right to a fair trial, meaning whether the State can show beyond a reasonable doubt that the misconduct did not affect the trial's outcome." *State v. Longoria*, 301 Kan. 489, 530, 343 P.3d 1128 (2015).

In denying Clements' motion for a new trial based on juror misconduct, the trial court determined that the evidence did not rise to the level of what is required for a new trial. Essentially, the trial court jumped straight to the prejudice prong by accepting H.B.'s testimony and making all inferences in Clements' favor. See *State v. Johnson*, 40 Kan. App. 2d 1059, 1067, 198 P.3d 769 (2008). If Clements knew of juror misconduct before the verdict but did not object, then Clements could not later raise the issue as grounds for a new trial. The trial court found that H.B. did not identify the juror and tell Clements' counsel until after the verdict. Thus, Clements was not barred from raising the issue. Similarly, the trial court assumed that the statement in the hallway happened exactly as H.B. described. By making these presumptions, the trial court correctly determined that it could rule on the motion for a new trial without recalling the jury. The trial court did not err by refusing to recall jurors.

Our Supreme Court reviewed similar juror misconduct in *State v. Kirkpatrick*, 286 Kan. 329, 184 P.3d 247 (2008), *overruled on other grounds by State v. Barlett*, 308 Kan. 78, 418 P.3d 1253 (2018). John P. Kirkpatrick was convicted of felony murder. During the trial, juror K.D. visited her place of business and made comments about the trial. A coworker's affidavit stated that K.D. said that "'she did not know why everyone was wasting their time and that he was guilty.'" 286 Kan. at 351. As in this case, K.D. made

11

her comment during trial, before jury deliberations. The *Kirkpatrick* court ruled that the comments were juror misconduct but did not require a new trial. The *Kirkpatrick* court noted that the affidavit did not suggest that K.D.'s opinion was final and any questions about the influence of further evidence were not permissible. 286 Kan. at 355.

The *Kirkpatrick* court also cited approvingly to a similar case:  *State v. Allen*, 4 Kan. App. 2d 534, 609 P.2d 219 (1980). In *Allen*, a juror named Baker discussed the trial with three separate people. The *Allen* court found it significant that even if Baker had made up his mind or formed an opinion, there was no indication that his opinion was based on anything other than the evidence. 4 Kan. App. 2d at 537-38. See also *State v. Cady*, 248 Kan. 743, 749-50, 811 P.2d 1130 (1991) (reversing and remanding for prosecutorial misconduct but suggesting in dicta that a juror's comment, "'That son-of-a-bitch is guilty as hell,'" would not by itself require reversal).

Here, like in *Kirkpatrick*, the statement does not suggest that the juror's opinion was final, that it could not change during trial, or that it was based on anything outside the evidence that the State had presented thus far. Second, the evidence establishes that the person who spoke the statement was a juror, not that the person to whom the statement was directed was also a juror. Even if the person to whom the statement was directed were a juror, no evidence could have been admitted showing what effect, if any, the comment had on that juror's mental processes. Finally, it should be noted that, unlike *Kirkpatrick* and *Allen*, the juror did not specify that he felt Clements was guilty. The statement that "[t]his is a piece of cake. . . . We already know how this is going to end" could also be made by a juror who viewed the State's evidence as weak and believed that an acquittal was inevitable. Although the jury found Clements guilty, using hindsight to make assumptions about juror thought processes is improper. Under K.S.A. 60-441, courts may not inquire if a juror changed positions to arrive at a guilty verdict. Because Clements fails to show that he was prejudiced by the juror misconduct, the trial court properly denied Clements' motion for a new trial.

12

*Did the Jury Commit Misconduct in its Review of the Evidence?*

Clements next argues that the entire jury committed misconduct in failing to review and assess all the evidence submitted in the case. The State responds that the brief deliberation does not show that the jury failed to fully consider the evidence.

At the close of evidence, Clements submitted one audio exhibit for the jury to review in addition to the State's audio and video recordings. Clements' counsel calculated the total running time of all exhibits at over four hours. The jury deliberated for 40 minutes before returning with a guilty verdict.

For the first time on appeal, Clements argues that the jury committed misconduct in its deliberations because it did not review all the evidence. Issues not raised before the trial court cannot be raised on appeal. See *State v. Kelly*, 298 Kan. 965, 971, 318 P.3d 987 (2014).

There are several exceptions to this general rule that a new legal theory may not be asserted for the first time on appeal, including: (1) that "'the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case'"; (2) that consideration of the theory "'is necessary to serve the ends of justice or to prevent denial of fundamental rights'"; and (3) that the trial court was right for the wrong reason. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019).

We draw guidance from decisions dealing with new claims on appeal, stating the following:

> "The decision to review an unpreserved claim under an exception is a prudential
> one. *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017); *State v. Frye*, 294 Kan.

13

364, 369, 277 P.3d 1091 (2012). Even if an exception would support a decision to review a new claim, we have no obligation to do so. *Parry*, 305 Kan. at 1192.

"We decline to utilize any potentially applicable exception to review Gray's new claim. Gray had the opportunity to present his arguments to the district court and failed to do so. This failure deprived the trial judge of the opportunity to address the issue in the context of this case and such an analysis would have benefitted our review." *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020).

Clements asserts that consideration of the issue is required to serve the ends of justice and prevent the denial of fundamental rights because he was not afforded his right to a fair and impartial jury. But Clements fails to show that the jury's acts were misconduct or that the actions prejudiced his fair trial rights.

Clements argues that the jury acted in defiance of the jury instruction to consider and weigh everything admitted into evidence. Clements notes that the jury could not have reviewed all the evidence in the case. But the State correctly characterizes this argument as requiring the jury to watch or listen to every minute of video or audio before arriving at a verdict. The State argues that the jury followed its instructions because the jury was told only to "consider and weigh" all the evidence, not to "review" the evidence.

Appellate courts presume that the jury followed instructions. *State v. Holt*, 285 Kan. 760, 770, 175 P.3d 239 (2008). A jury may request to watch a particular video during deliberations. See generally *State v. Becker*, 311 Kan. 176, 182, 459 P.3d 173 (2020). Nevertheless, as Clements admits in his brief, no Kansas authority has stated that not watching or listening to all or some video or audio exhibits equates to jury misconduct. Further, although 40 minutes of deliberation is not time enough to review 4 hours of recordings submitted by the State and by Clements, it would be enough time to listen to Clements' only exhibit, a 16-minute audio recording. We cannot speculate about which exhibits the jury considered weighty enough to review during deliberation. See *State v. Adams*, 35 Kan. App. 2d 439, 449, 131 P.3d 556 (2006). Clements fails to explain

14

why the jury would be required to watch or listen to all the recordings to render a proper verdict. Or, stated more precisely, Clements fails to show that not watching or listening to all recordings is jury misconduct. Thus, faced with only Clements' conclusory motion for a new trial, we reject this argument.

*Did the Trial Court Err in Refusing to Admit Evidence of the Victim's Sexual History?*

Next, Clements argues that the trial court erred in excluding key pieces of evidence crucial to his defense. Clements claims that the evidence was necessary to impeach J.E.'s credibility and to show motive for a false accusation. The State, however, argues that the trial court properly excluded the evidence under K.S.A. 2017 Supp. 21-5502, also known as the rape shield statute.

The threshold question on evidence admissibility is relevance. *State v. Berriozabal*, 291 Kan. 568, 586, 243 P.3d 352 (2010). Evidence is relevant when it is both probative and material. See K.S.A. 60-401(b). Appellate courts review whether evidence is probative for abuse of discretion; materiality is judged de novo. 291 Kan. at 586.

The rape shield statute also makes relevance the threshold question but includes additional considerations. K.S.A. 2020 Supp. 21-5502 prohibits the admission of evidence of the victim's previous sexual conduct with any person, including the defendant, unless the trial court first determines the evidence to be relevant and otherwise admissible. Our Supreme Court has stated that sexual history evidence may be material if it is relevant to issues such as the identity of the rapist, consent of the complaining witness, or whether the defendant actually had intercourse with the complaining witness. "The trial court's determination of whether evidence of prior sexual conduct will be probative of a material issue will not be overturned on appeal if reasonable minds could disagree as to the court's decision." *Berriozabal*, 291 Kan. at 586.

15

Clements moved to admit J.E.'s medical records into evidence to impeach J.E. on statements that sex with Clements resulted in pregnancies. He also requested that the trial court admit into evidence an audio recording which included Clements reading text messages between J.E. and a third party aloud to police. Clements argues that this evidence was critical to his defense. Clements explained to the officers, when asked why J.E. would make the allegations, that J.E. was mad at him. Clements did not want J.E. "running around" with a young man named G.S. Clements' defense was that he never had sex with J.E., but that she made up a story because of his attempts to keep J.E. away from G.S. Clements wanted to impeach J.E. on the issue of pregnancies with medical records which showed that she told providers that she had not been sexually active, that she was not pregnant, and that she had not been pregnant.

The State responded that K.S.A. 2017 Supp. 21-5502 prohibited the admission of this evidence as previous sexual conduct. The trial court correctly ruled that Clements had not complied with the procedural requirements for introducing the evidence and, therefore, it could not be admitted.

K.S.A. 2020 Supp. 21-5502(b) requires that a defendant move the court to admit previous sexual conduct evidence, stating as follows:

> "[E]vidence of the complaining witness' previous sexual conduct with any person including the defendant shall not be admissible, and no reference shall be made thereto in any proceeding before the court, except under the following conditions: The defendant shall make a written motion to the court to admit evidence or testimony concerning the previous sexual conduct of the complaining witness. The motion shall be made at least seven days before the commencement of the proceeding unless that requirement is waived by the court. The motion shall state the nature of such evidence or testimony and its relevancy and shall be accompanied by an affidavit in which an offer of proof of the previous sexual conduct of the complaining witness is stated."

16

Here, trial was set for Monday, June 17, 2017. The trial court held a hearing on Friday, June 14, 2017, to address any pending motions. At the hearing, for the first time, Clements asked to introduce recordings of police interviews in which J.E. discusses multiple pregnancies. Clements' written motion also requested introduction of medical records which contradicted J.E.'s recorded statements. The trial court denied both requests solely on the grounds that Clements had not provided the appropriate notice. Then, trial was continued to July 2017 and then continued to December 2017. But Clements did not move to admit evidence of sexual history a second time.

In *State v. Smith*, 39 Kan. App. 2d 204, 178 P.3d 672 (2008), Jesse Smith appealed his conviction and sentence for rape. On appeal, Smith argued that the trial court erred by refusing to allow evidence of the victim's sexual conduct on the day before the purported rape. This court noted that Smith did not move to allow sexual history evidence and, thus, the statute precluded admission of such evidence at trial. This court determined that it need not address the merits of Smith's argument because of this procedural defect. 39 Kan. App. 2d at 214-15. Because Clements failed to comply with the procedural requirements of K.S.A. 2017 Supp. 21-5502, we reject Clements' argument.

*Did the Trial Court Abuse Its Discretion in Denying a Continuance When Clements Requested Time to Replace an Expert Witness?*

Clements next argues that the trial court abused its discretion when it denied his request for a continuance to find a second expert witness. Clements felt that the expert witness who had produced a report had not followed instructions and had included improper statements in the report. Thus, Clements moved to continue the trial to have time for a new report from a new expert. The trial court denied the motion.

17

Where a defendant claims the denial of a continuance interfered with his or her ability to present a defense, the appellate court will review the question de novo. *State v. Gentry*, 310 Kan. 715, 734, 449 P.3d 429 (2019).

Clements argues that the trial court erred by not granting him a continuance to secure a specific expert whose specific knowledge and skills were necessary to his defense. At a hearing in July 2017, Clements' counsel told the court that she had just received a SANE/SART report on J.E. which contradicted J.E.'s earlier statements to police. Clements' counsel believed that police did not follow the protocols for interviewing an alleged victim of sexual abuse. Clements' counsel knew of an expert witness who could testify about the proper protocols. She asked for time to have the expert approved by the Board of Indigents' Defense Service (BIDS). The trial court continued the trial to December 2017.

At a hearing in October 2017, Clements' counsel told the court that "BIDS put me back over a month because we went back and forth on who I can have as an expert." Clements' counsel stated that BIDS approved Dr. Goodman in Hutchinson but "not the Dr. Barnett that I wanted to use, because that was out of Lawrence." Nevertheless, Clements' counsel stated that she reviewed Dr. Goodman's CV and concluded: "[H]e can cover Finding Words and the effects. He can cover all of it."

At a hearing in November 2017, Clements' counsel described Dr. Goodman's report as "unusable" and "really awful." She began by reminding the trial court that she wanted to use "Dr. Barnett out of Lawrence, Kansas," but BIDS did not permit it. Dr. Goodman was selected because he was closer. Clements' counsel explained that she had contacted Dr. Goodman, stating the following: "He seemed to understand what I needed as far as what I wanted him to do as far as police procedure and Finding Words, and the proper interview techniques for a child that's been the victim of sexual abuse." But the report she got back was "not even remotely close to the topic I asked this man to discuss."

18

According to Clements' counsel, "He invaded the purview of the jury. He made statements about her credibility. He—he didn't do what he was asked to do."

Clements' counsel requested a continuance to get back with BIDS and "request the permission to hire the expert that I know understands the topic." She stated the following: "[H]e won't necessarily agree with me, Your Honor, but understands the topic." The State objected to the continuance. The State argued that Dr. Goodman answered the questions he was asked. But the State acknowledged that also the report "did include a lot in here that's not going to be able to be presented to the jury on whether she was telling the truth."

The trial court denied the motion to continue. The trial court considered the use of a flawed report, stating the following:

> "I haven't reviewed the report, but apparently [the answers given] were not favorable with regard to certain statements that expert made that are beyond what the jury should be able to hear. Those can certainly, if the expert were presenting at trial, can certainly be part of a motion in limine and an instruction to the expert at the time of trial with regard to what he can and cannot say. So I am not particularly concerned about that."

On appeal, Clements argues that the trial court's denial of the continuance prevented him from presenting his defense of choice. The right to present a complete defense is fundamental, but its protection is tempered by sensible control of the criminal trial process. While a defendant is entitled to a meaningful opportunity to present a complete defense, the right is subject to procedural rules and evidentiary rulings that serve legitimate interests. *State v. Carr*, 300 Kan. 1, 209, 331 P.3d 544 (2014), *rev'd on other grounds and remanded* 577 U.S. 108, 136 S. Ct. 633, 193 L. Ed. 2d 535 (2016). But a defendant's right to examine witnesses is not absolute and can be overridden by other legitimate interests of the criminal trial process. *State v. Green*, 254 Kan. 669, 675, 867 P.2d 366 (1994).

19

Clements relies on the trial court's denial of a continuance to retain an expert in *State v. Huntley*, 39 Kan. App. 2d 180, 185-90, 177 P.3d 1001 (2008). In *Huntley*, this court stated that a trial court may abuse its discretion by refusing to grant a continuance so that the defense can retain an expert witness whose testimony may be crucial to the defense. 39 Kan. App. 2d at 186. The trial court denied the motion, ruling that the testimony of the expert would not be admissible. This court ruled that the trial court made an error of law because the testimony was admissible. 39 Kan. App. 2d at 187-90.

The difficulty with applying *Huntley* here is that Huntley had no expert witness and was seeking one. Clements here retained one expert witness and was seeking a different expert. Clements cites no case in which a trial court erred by not allowing a second expert witness on the same matter. Conversely, "[t]he Constitution does not require that an indigent criminal defendant be able to retain the expert of his choosing, only that a competent expert be made available." *Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006); see also *State v. Lee*, 221 Kan. 109, 115-16, 558 P.2d 1096 (1976) (ruling that trial court correctly denied subsequent motions for mental examination after the first exam deemed defendant competent to stand trial); *State v. King*, 2 Kan. App. 2d 503, 504-05, 582 P.2d 309 (1978) (ruling that trial court did not err in refusing to allow the defendant funds for an expert of his own choosing).

Clements also argues that the trial court abused its discretion under K.S.A. 22-4508 in denying his request for an expert. K.S.A. 22-4508 allows an indigent defendant to request an expert in an ex parte application to the trial court. This argument is premature. Clements requested a continuance, not an expert. The continuance would allow Clements to request permission from BIDS to hire a second expert. The record does not contain a request to the court for an expert. Presumably, Clements planned to request the court for an expert under K.S.A. 22-4508 later, after receiving a continuance.

20

But Clements offered no reason to believe that BIDS was inclined to permit him to hire a second expert.

When a party has requested a continuance to secure attendance of a witness at trial, the factors relevant to a decision regarding that request include: "the possible prejudice to the parties, the diligence or lack thereof in attempting to secure a witness, the materiality and importance of the probable testimony, and the probability of the witness' appearance at a later date if a continuance is granted." *State v. Carter*, 284 Kan. 312, 319, 160 P.3d 457 (2007); *State v. Lee*, 45 Kan. App. 2d 1001, 1012, 257 P.3d 799 (2011).

Under the fourth factor, the probability of the witness' appearance at the later trial date was low. Clements made no showing that he would or could retain the second expert witness, especially given BIDS' initial decision. As for the materiality and importance of the probable testimony, Clements' counsel acknowledged that the second expert's report would not necessarily support Clements' defense. In sum, Clements was not prejudiced by the denial of a continuance for him to pursue the possibility of retaining an expert witness who might provide a more favorable report. So the trial court properly denied Clements' motion for continuance.

*Did the Prosecutor Commit Reversible Error in Closing Argument?*

Clements next argues that several comments during closing argument require reversal for prosecutorial error. The State contends that the prosecutor did not err, and if she did, the error was harmless.

The appellate court uses a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

"To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" 305 Kan. at 109.

See also *State v. Blansett*, 309 Kan. 401, 412, 435 P.3d 1136 (2019). The statutory harmlessness test also applies to prosecutorial error, but when analyzing both constitutional and nonconstitutional error, appellate courts only need to address the higher standard of constitutional error. *Sherman*, 305 Kan. at 109.

Even if the prosecutor's actions were egregious, reversal of a criminal conviction is not an appropriate sanction if the actions are determined to satisfy the constitutional harmlessness test. *Sherman*, 305 Kan. at 114. Courts may still use prosecutorial misconduct as a descriptor for more serious occurrences. *State v. Chandler*, 307 Kan. 657, 695, 414 P.3d 713 (2018).

The extent of any ameliorating effect of a jury admonition attempting to remedy a prosecutor's error must be considered in determining whether the erroneous conduct prejudiced the jury and denied the defendant a fair trial. *State v. Barber*, 302 Kan. 367, 383, 353 P.3d 1108 (2015).

Appellate courts will review a prosecutorial error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument even without a

22

timely objection, but the court may figure the presence or absence of an objection into its analysis of the alleged error. *State v. Butler*, 307 Kan. 831, 864, 416 P.3d 116 (2018); see *State v. McBride*, 307 Kan. 60, 64-65, 405 P.3d 1196 (2017) (statements during closing argument).

"'[A] prosecutor's improper comment or argument can be prejudicial, even if the [error] was extemporaneous and made under the stress of rebutting arguments made by defense counsel.' [Citation omitted]." *State v. Roeder*, 300 Kan. 901, 934, 336 P.3d 831 (2014) (disavowing language in previous cases that defense provocation can justify prosecutorial misconduct); *State v. Sprague*, 303 Kan. 418, 429, 362 P.3d 828 (2015) (stating the "'open-the-door rule does not insulate a prosecutor from a finding of misconduct'" when responding to defense arguments).

A misstatement of controlling law must be reviewed on appeal, regardless of a timely objection at trial, to protect a defendant's right to due process. When a misstatement of controlling law is made deliberately, it is outside the considerable latitude given to prosecutors during their arguments. *State v. Gunby*, 282 Kan. 39, 63, 144 P.3d 647 (2006); see also *State v. Tahah*, 302 Kan. 783, 791, 358 P.3d 819 (2015) (prosecutor's statement that, in effect, asserted the defendant could not rely on inconsistent defenses was a misstatement of the law and impermissible).

*The prosecutor did not shift the burden of proof.*

Clements asserts that the prosecutor made three types of errors during closing arguments. First, Clements argues that the prosecutor shifted the burden of proof. During closing argument, Clements twice objected to the prosecutor's statements as burden shifting. The first statement which Clements argues shifted the burden of proof related to the date of the second rape, which J.E. described as happening during a camping trip. As an element, the State needed to prove beyond a reasonable doubt that the rape happened

on or about July 18, 2014. The prosecutor recapped the evidence that the State provided. She reminded the jury that the Kansas Department of Wildlife and Parks checked its records and found only two permits issued in 2014 under the name H.B. or Clements, one permit per day for July 18 and July 19. She also recalled testimony from J.E. and one other witness that the camping trip was in the summer of 2014. Then, the prosecutor addressed the weakness of evidence to the contrary, with the transcript showing the following:

> "[Prosecutor:] While you heard testimony from [H.B.] that she thinks that the camping trip was sometime closer to the fall of 2014, what you didn't see in the evidence were any camping permit records that supported [H.B.'s]; statement that the camping trip was not on or about July 18, 2014.
> "The defense cannot provide any evidence to when the camping—
> "[Defense counsel]: Objection, Your Honor."

It is improper for the prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof. See *State v. Tosh*, 278 Kan. 83, 89-92, 91 P.3d 1204 (2004). But our Supreme Court has stated the following: "[A] prosecutor does not shift the burden of proof by pointing out a lack of evidence to support a defense . . . ." *Williams*, 299 Kan. at 940. And prosecutors have "'considerable latitude'" to comment on the weakness of the defense. *Blansett*, 309 Kan. at 414.

The prosecutor here began with facts which were not in dispute. She stated J.E.'s date of birth and Clements' age, noting that this evidence was uncontradicted. She also noted that the uncontradicted evidence showed only one trip in 2014, where all three trial witnesses went camping with Clements. The prosecutor then described the uncontradicted evidence that one witness had only been to that campsite once. She explained that the camping permits had a date on them, and all the State's witnesses confirmed the date except H.B., who thought the trip was in autumn. But no evidence supported H.B.'s assertion.

24

Clements argues a second instance of burden shifting when the prosecutor allegedly tried to shift the burden to Clements to produce evidence that J.E. was angry with Clements. The prosecutor stated the following, "We hear about this fight. She was mad at [Clements] about something. We heard [Clements] say that in his interview, but we didn't hear any further testimony about what that fight was about or why 18, 19 months later—" and then the defense objected. The trial court sustained the objection. The prosecutor then rephrased, saying the following, "The only testimony we heard about [J.E.] and [Clements] having a fight was during [Clements'] interrogation, when [Clements] said they had a fight the day before, she was going to get him back." This restatement drew no objection.

"Often the line between permissible and impermissible argument is context dependent." *State v. Martinez*, 311 Kan. 919, 923, 468 P.3d 319 (2020) (citing *Blansett*, 309 Kan. at 412-13). Appellate courts do not consider a prosecutor's statement in isolation. The language used is outside the wide latitude allowed a prosecutor if the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify or to shift the burden of proof. But the prosecutor may point out a lack of evidence to support a defense or to corroborate a defendant's argument regarding holes in the State's case. *Martinez*, 311 Kan. at 923.

The prosecutor here did not comment on Clements' failure to testify or argue that Clements had to prove that J.E.'s accusations were false. Instead, the prosecutor was summarizing the testimony of the State's witnesses, noting what was present and what was absent. Immediately after the disputed comment, the prosecutor recapped the testimony of J.E.'s peer and confidante, H.B., and J.E.'s guidance counselor. None of these witnesses provided testimony on direct or cross-examination that J.E. was angry at Clements or that they had a fight. The prosecutor's statements were an accurate description of the weakness of evidence supporting Clements' defense.

25

*The prosecutor did not bolster the witness' credibility.*

Clements argues that the prosecutor committed error by improperly bolstering the credibility of J.E. during closing. The prosecutor asked the following: "What motivation does [J.E.] have to lie about this?" and "What motive does [J.E.] have to lie about this?" The prosecutor also discussed J.E.'s first interview with police, stating the following: "I asked her several times today, were you truthful on that day? She said yes. The information she provided to them regarding having sex with [Clements] was true."

None of the comments that Clements challenges impermissibly vouch for J.E.'s credibility. "[A] prosecutor is not allowed to offer a personal opinion on credibility." *Williams*, 299 Kan. at 935. And prosecutors are not allowed to accuse witnesses of lying or tell the jury that a witness is truthful. In *State v. Knox*, 301 Kan. 671, 683, 347 P.3d 656 (2015), the prosecutor's statements that a witness was "'brutally honest'" and "'was on the stand telling you the truth'" were prosecutorial error.

Although it is improper for a prosecutor to offer personal opinions about credibility, it is not improper for a prosecutor to offer comments regarding the witness' motivation, or lack thereof, to be untruthful. But a prosecutor must base these comments solely on evidence and reasonable inferences drawn from the evidence without stating any personal opinion concerning a witness' credibility or making any accusations of lying. *State v. Ortega*, 300 Kan. 761, Syl. ¶ 3, 335 P.3d 93 (2014); see *State v. Snyder*, No. 119,452, 2020 WL 6372259, at *6 (Kan. App. 2020) (unpublished opinion).

The State's evidence here showed that J.E. had disclosed sexual misconduct, but J.E. also tried to retract her story. The prosecutor's statements insisted that the jury consider which version was more credible by considering all the evidence, including

26

J.E.'s motives for each of her statements. The comments that Clements complains about did not fall outside the wide latitude afforded prosecutors in closing argument.

*The prosecutor did not misstate the law.*

Clements argues that the prosecutor restated the "beyond a reasonable doubt" standard in a way which diluted the State's burden of proof. The statement was made in rebuttal, after Clements' attorney finished her closing argument. For context, Clements' attorney stated the following:

"I am asking that you find that there is a reasonable doubt in this matter, and [that you] acquit my client on all the charges, all three charges. You are all reasonable people. You've all heard the facts. If there is not doubt in your mind, I would be very surprised. I'm asking you to acquit him.

"Thank you."

The prosecutor began her rebuttal by stating the "beyond a reasonable doubt" standard as follows:

"Ladies and gentlemen, we just heard not a doubt. Burden of proof is not that there's not a doubt. It's that the State must prove it beyond a reasonable doubt, a reasonable doubt. Reasonable doubt is not the same thing as doubt. Reasonable doubt is what a reasonable person would have."

Clements' argument is flawed because the prosecutor correctly restated the reasonable doubt standard.

"Any attempt to lower the burden of proof—or even to define reasonable doubt—is misconduct. See *Magallanez*, 290 Kan. at 914 ('[P]rosecutors embellish on the definition of the burden of proof in criminal cases at their peril.'); *State v. Walker*, 276 Kan. 939, 956, 80 P.3d 1132 (2003) ('"Efforts to define reasonable doubt, other than as provided in

PIK Crim. [4th 51.010] . . . , usually lead to a hopeless thicket of redundant phrases and legalese, which tends to obfuscate rather than assist the jury in the discharge of its duty."')." *State v. Holt*, 300 Kan. 985, 1004, 336 P.3d 312 (2014).

The prosecutor's comment here is unlike the comments which appellate courts have ruled to be error. In *Magallanez*, the prosecutor stated that the measure of reasonable doubt is "'an individual standard . . . a standard that when you believe he's guilty you've passed beyond.'" 290 Kan. at 914. But a juror's mere belief that an accused individual is guilty does not automatically mean that the State has proved its case beyond a reasonable doubt. Our Supreme Court ruled that the prosecutor's statement was error. 290 Kan. at 914.

But in *State v. Wilson*, 281 Kan. 277, 130 P.3d 48 (2006), the prosecutor made the following attempt to explain reasonable doubt: "'I want you to look at the evidence, remember all the testimony that you heard, and go back to that definition of reasonable doubt that, unfortunately, no one can say in precise words what it is. You just have to intuitively know when you see it.'" 281 Kan. at 286. Our Supreme Court concluded that the prosecutor's statement properly stated the law regarding reasonable doubt. 281 Kan. at 287.

Here, as in *Wilson*, the prosecutor's statements were proper. The first part of the prosecutor's statement is a correct restatement of the law. "Burden of proof is not that there's not a doubt. It's that the State must prove it beyond a reasonable doubt, a reasonable doubt. Reasonable doubt is not the same thing as doubt." This part of the prosecutor's remark correctly states the law. Furthermore, there is no attempt to define reasonable doubt, but simply to separate it conceptually from doubt.

The prosecutor's last sentence on the matter is the following: "Reasonable doubt is what a reasonable person would have." This statement is a mere tautology, with the word

28

reasonable defining itself. It does not deviate from the judicially approved definition of reasonable doubt any more than the prosecutor's comment to the effect of "you know it when you see it" in *Wilson*. But the real question is if the prosecutor's statements on reasonable doubt altered or lowered the State's burden and misstated law. See *State v. Garcia-Garcia*, 309 Kan. 801, 816, 441 P.3d 52 (2019); but see *State v. Glasgow*, No. 113,155, 2016 WL 4582542, at *12 (Kan. App. 2016) (unpublished opinion) (holding that any statement by the prosecutor which deviates from the exact language of PIK Crim. 4th 51.010 is error). In *State v. Crawford*, 300 Kan. 740, 753, 334 P.3d 311 (2014), our Supreme Court warned that efforts to define the State's burden often lead the jury into "'a hopeless thicket of redundant phrases and legalese.'" While the prosecutor's statement here is certainly redundant, it does not have the injurious effect of lowering the State's burden. The prosecutor did not err in stating the "beyond a reasonable doubt" standard.

*Does Cumulative Error Require a Remand for New Trial?*

Next, Clements argues that the cumulative effect of trial errors deprived him of the right to a fair trial. Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *Hirsh*, 310 Kan. at 345. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in the context of the entire record, considering how the trial judge dealt with the errors as they arose; the nature and number of errors and their interrelationship, if any; and the overall strength of the evidence. 310 Kan. at 345-46.

When an appellate court finds no errors exist, the cumulative error doctrine cannot apply. *State v. Lemmie*, 311 Kan. 439, 455, 462 P.3d 161 (2020). A single error cannot support reversal under the cumulative error doctrine. *State v. Ballou*, 310 Kan. 591, 617, 448 P.3d 479 (2019).

The discussion in the preceding paragraphs explains that the trial court and the prosecutor did not err. For the preceding reasons, we affirm.

Affirmed.